J-A11043-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                   :  PENNSYLVANIA
                                                   :

            v.                                     :

ZACHARY ALLEN SMITH               :

          Appellant         :   No. 993 WDA 2022

Appeal from the Judgment of Sentence Entered June 17, 2022
In the Court of Common Pleas of Warren County Criminal Division at
No(s): CP-62-CR-0000300-2021

BEFORE:  BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED:  May 15, 2023**

Zachary Allen Smith (Smith) appeals from the judgment of sentence imposed in the Court of Common Pleas of Warren County (trial court) following his jury conviction of criminal conspiracy (contraband), two counts of possession with intent to deliver (PWID), and criminal use of a communication facility.[1]  On appeal, Smith challenges the sufficiency and weight of the evidence supporting his conviction.  We affirm.

**I.**

This case arises from Smith's involvement in planning to obtain Suboxone to distribute to fellow inmates at the Warren County Prison in June

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 903(a)(1), 35 P.S. § 780-113(a)(30), 18 Pa.C.S. § 7512.

2021. Smith used the inmate messaging and recorded telephone calling system on several occasions to arrange for delivery of the drug with his cellmate Bruce Campbell (Campbell) and Campbell's then-girlfriend, Amanda Brown (Brown).

At Smith's May 24, 2022 jury trial, Warren County Prison Warden Jon Collins explained that the prison maintains a call log of inmate phone calls stating the date, time, length of the call and the phone number of the person listed on the inmate's call list. Phone calls are screened and recorded, as are emails sent through jail tablets. Warden Collins explained that inmates are permitted to have family or friends drop off new articles of clothing during the first 14 days of their incarceration. This clothing must be new, in the original packaging, white in color, and are commonly referred to as "Whites." (***See*** N.T. Trial, 5/24/22, at 57).

Regarding medications in the prison, Warden Collins stated that although inmates are typically administered drugs they have already been prescribed upon assessment, certain medications are not allowed, including opioids and Suboxone. Warden Collins recounted that in June 2021, he received reliable information from an inmate that drugs were being smuggled in through Whites and he began investigating Smith and Campbell by monitoring their phone calls, text messages and emails. Warden Collins testified that on June 21, 2021, a female brought in Whites for Campbell and Officer Sarah Eckman refused to accept them because Campbell had exceeded

his 14-day allowance for Whites. The female left the facility but returned a short time later and indicated that the Whites were for a different inmate, David Smiley. Warden Collins and Officer Eckman searched the items while wearing a bodycam and found Suboxone sewn into the underwear.

Brown testified that she first brought Suboxone into the jail for Campbell on or around June 5, 2021, by sewing it into underwear. She relayed that in a June 10, 2021 email, Campbell told her, "I got my whites . . . thank you so much babe, my bunky also needs whites . . . smittys name is zachary allen smith, don't worry about money for now because I have everything I need if you know what I mean." (*Id.* at 69). Brown explained that in this email, Campbell was referring to the shirts and underwear she had brought in containing Suboxone. In a subsequent email, Campbell asked Brown for "more today . . . because I got rid of my whites [for] 50.00 in food" and that he "NEED 4 times WHAT U JUST GAVE ME," which Brown interpreted to mean that she was to put additional Suboxone in the Whites. (*Id.* at 71-72).

The jury listened to phone calls between Brown and Campbell recorded that same day, and Brown testified that Campbell's reference to "Smitty" was to Smith, that they were talking "about me going and getting the Whites and bringing in some more of the Suboxone" and "picking up a backpack at [Smith's] dad's house that had some Suboxone in it." (*Id.* at 74). Campbell and Brown again spoke about the backpack in a phone conversation on June 13, 2021.

Brown testified that she and Smith then began to email each another directly and in a June 15, 2021 message, Smith indicated that he was "trying to get ahold of my dad right now" and was "looking for loyalty, especially because of the game I'm in, I need someone to be there by my side no matter what." (*Id.* at 81).  In a June 16, 2021 phone call, Campbell gave Brown the home address of Smith's father and indicated that the drugs would be in the front part of the backpack.  In a June 19, 2012 email exchange, Smith asked Brown if she went "up there" and she responded, "Yes I been wanting to talk to you I took the whole bag . . . there was 9 and two halves." (*Id.* at 100-01).  Brown testified that although she told Smith that there were nine and two-halve pills, there were actually 15 pills in the backpack and she kept the rest.  Smith thanked her and asked her when she was coming to the jail.  Campbell told her to drop the items off for inmate Daniel Smiley.

On June 20, 2021, multiple communications between Brown, Campbell and Smith were exchanged expressing frustration that Brown could not find transportation to the jail to bring the Whites.  Smith tried to arrange a ride for her and told her if Smiley "doesn't come thru, we have someone that will[.]" (*Id.* at 109).  On June 21, 2021, Brown and her sister, Julie Arnold, took the Whites labeled with Smiley's name to the prison and Arnold brought them in because Smith was on probation.  Officer Eckman initially refused acceptance of the Whites because Arnold used Campbell's name, but she accepted them when Arnold brought them in for Smiley.  Brown testified that she was

arrested in July for her role in the incident, and that everything she testified to at trial was truthful.

On cross-examination, Brown acknowledged that when she was arrested, she told authorities that Campbell had arranged for delivery of the Whites and she did not mention Smith's name at all. The first time Brown advised authorities that Smith was involved in the incident was on March 2, 2022, one day before Smith was originally scheduled for trial. On that date, Brown was put in jail for a probation violation. The Commonwealth offered her a plea bargain to conspiracy for contraband and agreed to petition the court to *nolle pross* ten felony charges that had been brought against her. Brown also testified that she initially lied to police about her participation in the incident because she was embarrassed and that she was telling the truth now. Brown acknowledged that in the recorded communications she had with Smith and Campbell, they did not expressly use the terms "Suboxone" or "pills." (**See id.** at 116, 118).

The jury found Smith guilty of the above-stated charges and the trial court deferred sentencing for preparation of a pre-sentence investigation report. On June 17, 2022, the trial court sentenced Smith to an aggregate term of 72 to 144 months of incarceration. It denied Smith's post-sentence motion disputing the sufficiency and weight of the evidence on August 5, 2022, after a hearing. In doing so, the trial court found that while "some of the evidence was circumstantial [] there was certainly direct evidence and

compelling evidence that there was a conspiracy to bring the Suboxone into the jail . . . so all of the four offenses were fully supported by the evidence presented by the Commonwealth." (N.T. Hearing, 8/05/22, at 4). Smith timely appealed and he and the trial court complied with Rule 1925. **See** Pa.R.A.P. 1925 (a)-(b).

## II.

### A.

Smith first challenges the sufficiency of the evidence supporting the criminal conspiracy, PWID and criminal use of a communication facility offenses. (**See** Smith's Brief, at 10-13).[2] Smith contends the Commonwealth's evidence failed show that there was an agreement between himself, Campbell and Brown to bring Suboxone into the prison, where Brown merely testified to "some ambiguous language that she argued established an

---

[2] Our standard of review for a challenge to the sufficiency of the evidence is well-established:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

**Commonwealth v. Arias**, 286 A.3d 341, 349 (Pa. Super. 2022) (citations omitted).

agreement to deliver the pills." (*Id.* at 10). Smith maintains that the testimony evidenced only that he intended for Brown to retrieve his backpack. (*See id.* at 13).

Under the Crimes Code, "[a] person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime[.]" 18 Pa.C.S. § 903(a)(1).

As to the sufficiency of evidence offered to prove conspiracy, this Court has determined:

> Circumstantial evidence may provide proof of the conspiracy. The conduct of the parties and the circumstances surrounding such conduct may create a 'web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt. Additionally:
>
> An agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

*Commonwealth v. Irvin*, 134 A.3d 67, 76 (Pa. Super. 2016) (citations omitted).

"To establish the offense of PWID, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled

substance with the intent to deliver it." ***Commonwealth v. Greenlee***, 212 A.3d 1038, 1045 (Pa. Super. 2019) (citation omitted); ***see also*** 35 P.S. § 780-113(a)(30). Lastly, the Crimes Code defines the offense of criminal use of a communication facility as using "a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title or under . . . the Controlled Substance, Drug, Device and Cosmetic Act." 18 Pa.C.S. § 7512(a). For a defendant to be found guilty of this offense, the Commonwealth must present evidence establishing that he used a communication facility to complete or attempt a felony. ***See Commonwealth v. Steele***, 234 A.3d 840, 847 (Pa. Super. 2020).

In the instant case, the evidence reflects that Warden Collins began monitoring the communications of cellmates Smith and Campbell after he received reliable information that Suboxone was being brought into the prison using Whites dropped off for inmates. Brown testified to Smith's role in securing the Suboxone through his father, which she obtained in a backpack at Smith's parents' residence at the direction of the inmates. Brown, Campbell and Smith sent multiple email messages to one another discussing the logistics of the Suboxone delivery during the time period immediately preceding confiscation of the drug sewn into the Whites by prison officials. Although they did not use the specific word "Suboxone" in the communications, the jury could reasonably infer that they were referencing

the drug when considering the context and the circumstances surrounding their conversations.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, *see Arias*, *supra* at 349, the evidence was sufficient to establish the existence of an agreement between Brown, Campbell and Smith to distribute Suboxone in the jail. Accordingly, Smith's sufficiency challenges merit no relief.

**B.**

Smith next challenges the weight of the evidence supporting his conviction. (*See* Smith's Brief, at 13-15). Smith contends the verdict is supported only by ambiguous recorded communications, and he characterizes Brown's testimony explaining them as "highly suspect" and unreliable. (*Id.* at 15). Smith points to Brown's initial denial of her role in the incident and her delay in reporting Smith's involvement until she was incarcerated for a probation violation and offered a plea bargain to testify against him. Given these issues with Brown's testimony, Smith posits that the defense's version of events is "far more believable." (*Id.*).[3]

---

[3]

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts,

We observe that in considering and assigning weight to the evidence presented at trial, "it is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses[.]" *Commonwealth v. Houser*, 18 A.3d 1128, 1136 (Pa. 2011), *cert. denied*, 565 U.S. 1247 (2012) (citation omitted). Additionally, "a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice." *Id.* (citation omitted).

Instantly, Smith's argument on this issue is essentially a credibility assessment of Brown's testimony, viewed from a perspective most favorable to himself. However, the jury was aware of the purported issues with Brown's testimony through defense counsel's thorough cross-examination, and it was free to credit her version of events and reject the defense theory of the case.

---

certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

To successfully challenge the weight of the evidence, a defendant must prove the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Arias*, *supra* at 352 (citations and quotation marks omitted).

- 10 -

Further, Brown's testimony was supported by recorded phone calls and emails evidencing Smith's involvement in obtaining Suboxone from his father.

Although Smith asks us to accept his version of events, it was within the province of the jury to believe all, part or none of the evidence and to determine the credibility of Brown's testimony in light of all of the evidence presented. *See Houser*, *supra* at 1136. Because the trial court did not abuse its discretion in finding that the verdict was not so contrary to the evidence as to shock its conscience, Smith's challenge to the weight of the evidence fails.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/15/2023